Jordan A. Kroop (jkroop@perkinscoie.com)
Jean-Jacques Cabou (jcabou@perkinscoie.com)
Deborah M. Gutfeld (dgutfeld@perkinscoie.com)
PERKINS COIE LLP
1900 Sixteenth Street
Suite 1400
Denver, CO 80202-5255
(303) 291-2300

Counsel for Robert Lamey and Paige Heid

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| In re | |
| | Case No. 16-18612-MER |
| IMOGENE AND WILLIE, LLC, a Colorado limited liability company, | Chapter 11 |
| EIN #46-3035807 | |
| Debtor. | |

## DECLARATION OF ROBERT LAMEY IN SUPPORT OF EMERGENCY MOTION TO APPOINT A CHAPTER 11 TRUSTEE

Robert Lamey, under penalty of perjury, declares:

1.      I am a member and manager of Imogene and Willie, LLC, a Colorado limited liability company, and the "Debtor" in this proceeding, which I commenced with the filing of an involuntary petition on August 30, 2016. The matters declared here are known to be personally. I am of legal age, a resident of the state of Colorado, and legally competent to testify to the following matters and, if called to do so, I would do so willingly under oath.

2.      The Debtor is (or was) engaged in the business of designing, manufacturing, and selling denim blue jeans. The Debtor was founded by Carrie and Matthew Eddmenson, husband and wife who reside in California, in or about January 2009 in Nashville, TN.

3.      The Debtor opened a facility in Tennessee and began making and selling jeans there in early 2009. The Eddmensons subsequently opened a retail location at 2601 12th Avenue South, Nashville, Tennessee, and later opened a second location at 1306 W Burnside Street, Portland, Oregon. The Debtor's jeans were also sold in other upscale retail stores nationwide and online through the Debtor's website.

4.      The Eddmensons and other smaller investors initially capitalized the Debtor. Eventually, the Eddmensons sought more significant investments from me and my wife, Paige Heid, to expand the Debtor's operations.

5.      Since July 19, 2013, my wife and I jointly own 46.5% and the Eddmensons own an additional 46.5% of the Debtor's equity member interests. 41 Lyons Plain Road, LLC owns the remaining 7% of the Debtor's equity member interests.

6.      I am a businessman with substantial experience and previous success in online upscale retail clothing sales. The Eddmensons sought my investment in the Debtor, assuring me that, if I would invest significant money, the Eddmensons would wisely and completely allocate those funds toward the Debtor's growth and development. The Eddmensons did not deliver on that assurance.

7.      Throughout the winter and spring of 2013, the Eddmensons communicated extensively with my wife and me regarding our investment in and plans for the Debtor. We invited the Eddmensons and other key personnel to our Colorado home on or about June 20, 2013, for a series of strategic discussions. The Eddmensons traveled to Colorado, stayed at our home, and engaged in multiple sessions with us to discuss the Debtor's path forward now that our investment was soon to close.

8.     Specifically, the Eddmensons represented that if we would purchase an ownership interest in the Debtor, the Eddmensons would immediately implement a business strategy to shore up the Debtor's "core business" by hiring additional employees to manufacture more clothing, working full-time to grow the business, ensuring the Debtor's "core denim" business had complete inventory for retail stores and online demand, building a healthy "core denim" products wholesale business, and manufacturing jeans locally and "in the South," consistent with the Debtor's story and branding (the "Business Strategy").

9.     Additionally, the Eddmensons agreed that the Debtor would open additional stores, expand marketing to reach new customers and grow the Debtor's market share, and expand the Debtor's offerings for men and women beyond the jeans and t-shirts for which the Debtor had become known.

10.     Through these specific representations and promises about the Business Strategy and the Debtor's operating future—representations and promises we reasonably relied on—the Eddmensons induced us to purchase invest in a 46.5% ownership interest in the Debtor.

11.     A few weeks after the Colorado strategy session, immediately before the close of our investment, we met with the Eddmensons at the Eddmensons's Nashville home for what would be the final pre-closing meeting. During that meeting, I asked the Eddmensons how they afforded such an expensively furnished and appointed home and furnishings on their relatively modest salaries. In response, Matt Eddmenson forcefully replied that he and Carrie do not carry balances on their credit cards, do not spend money they do not have, and that Matt's side business selling vintage motorcycles allowed them to supplement their income from the Debtor.

- 3 -

12.     Never, despite specific discussions regarding fiscal responsibility and personal spending, did the Eddmensons reveal their practice of spending the Debtor's operating cash on personal expenses and luxuries. Never did the Eddmensons reveal their practice of maintaining on the Debtor's books an "Advance Account" that facilitated the Eddmensons's personal use of the Debtor's money. Never did the Eddmensons reveal that the Debtor was days away from defaulting on a bank loan before our investment stabilized the Debtor's financial position. Never did the Eddmensons reveal that they carried substantial balances on their personal credit cards.

13.     The Eddmensons's promises and representations that they were fiscally conservative and free of personal debt were among the most material considerations in our decision to invest in the Debtor. Had the Eddmensons truthfully revealed the things they concealed, we would not have invested.

14.     The Eddmensons were asking us to purchase nearly half of the Debtor. Naturally, we wanted to know—and the Eddmensons led us to believe we did know—all the other people who had or could claim an equity interest in the Debtor. Yet, when we questioned them about existing investors, the Eddmensons told us that the Debtor's existing investors were all happy to be bought out and that, after our investment, the only owners or potential owners of the Debtor would be the Eddmensons, us, and an entity called 41 Lyons Plain Road, LLC. That wasn't true.

15.     The Eddmensons never revealed that one legacy investor had an agreement with the Eddmensons whereby, under certain circumstances, that investor would receive a 15% interest in the Debtor. Ultimately, that investor sued the Eddmensons and the Debtor in U.S. District Court in 2015 to enforce that right and a right to a related payout. That lawsuit was settled,

but we never would have invested in the Debtor if we had known there were other (potential) members beyond the Eddmensons and 41 Lyons.

16.     We capitalized the Debtor with $1,500,000 subject to the creation of an operating agreement and a promissory note, effective July 19, 2013. The Debtor made the $1,500,000 note payable to us, bearing interest at 1.22%, compounded annually (the "$1.5M Note"). The cover sheet attached to the note indicated that the Eddmensons would leverage the $1,500,000 loan from us to convince 41 Lyons, a creditor, to accept an ownership interest in the Debtor in exchange for a $192,815.42 debt.

17.     The Eddmensons agreed that the proceeds from our $1.5 Million loan would be allocated thus: $750,000 to pay down the Debtor's debt and to buy out existing investors and $750,000 to grow the Debtor under the Business Strategy.

18.     On June 20, 2013, I created Count Drizzle LLC, a Colorado limited liability company with its principal office address at 1310 Clinton Street, Suite 121, Nashville, TN 37203, in a filing with the Colorado Secretary of State. Under its operating agreement, Count Drizzle LLC merged with the Debtor. The resulting entity initially retained the name Count Drizzle LLC but did business as Imogene and Willie. In August 2013, Count Drizzle LLC changed its name to Imogene and Willie, LLC in a filing with the Colorado Secretary of State.

19.     On or around July 19, 2013, an operating agreement was created to govern Count Drizzle LLC dba Imogene and Willie (the "Operating Agreement"). Under the Operating Agreement, ownership of the Debtor was divided into 100 units and distributed to five members: my wife and I (46.5 units), the Eddmensons (46.5 units), and 41 Lyons (7 units).

20.     The Operating Agreement created five manager positions to direct the Debtor's operations and receive quarterly financial and business statements: me, my wife, Carrie, Matt, and 41 Lyons. The managers were required, among other things, to conduct themselves in good faith, to refrain from commingling personal funds with the Debtor's funds, and to refrain from conflict-of-interest transactions with the Debtor.

21.     The Operating Agreement explicitly stated that the Eddmensons must obtain all Managers' written approval before incurring any single expenditure or series of related expenditures exceeding $15,000 in one year. The Operating Agreement also empowered the Managers to approve any relocation of the Debtor's operations.

22.     At or about the same time the Operating Agreement was formed, the Eddmensons entered into individual employment agreements with the Debtor for full-time work, granting each the title of "President" and an annual salary of $75,000 with increases only on the Managers' approval (the "Employment Agreements"). As presidents, the Eddmensons controlled and were responsible for all aspects of the Debtor's finances, employees, and operations.

23.     The Employment Agreements contained a duty-of-loyalty provision requiring the Eddmensons to devote their full time to running the Debtor's business, to assign all intellectual property and intellectual property rights created from their work to the Debtor, to observe all policies, and to prohibit the Eddmensons from engaging with any competitor business during and after their employment for a specific period.

24.     In addition to insisting on the expenditure procedures and controls in the Operating Agreement as a condition of our investment, my

wife and I also insisted that the Debtor quickly hire a controller. The Debtor did so in August 2013 by hiring Celia Hughes.

25.     Soon after beginning work and diving into the Debtor's books, Hughes realized that something was seriously wrong. The Debtor seemed to have an unusually small amount of cash when compared with the Debtor's expenses and revenues. When Hughes questioned Carrie Eddmenson about the discrepancy, Carrie blamed the situation on unfair treatment and short payments from a large retailer, Anthropologie, which had placed a significant order. Carrie told Hughes that Anthropologie had, for no reason, significantly cut its order, leaving the Debtor stuck with expensive raw materials it had paid for but did not need. That, said Carrie, was why the Debtor was short on cash.

26.     We received a similar story from the Eddmensons about Anthropologie when contemplating our investment. Carrie told me that, before my investment, the Debtor had received a significant order from Anthropologie but that, after the Debtor purchased the needed raw materials, Anthropologie drastically and for no reason cut its order, sticking the Debtor with unneeded and expensive materials. The Eddmensons thus explained away the Debtor's cash-poor position before our investment by blaming Anthropologie's unfair treatment of the Debtor.

27.     The Eddmensons's story wasn't true. There was nothing capricious, unfair, or inexplicable about Anthropologie's cutting of its order. Anthropologie cut its order only when the Debtor failed to deliver the promised goods on the promised schedule. The Eddmensons hid the truth from us and, at least for a time, from Hughes. Had the Eddmensons told us the truth about the Anthropologie deal, we would not have invested in the Debtor.

28.     After the Debtor received the money we had leant it, the Eddmensons immediately began spending that money for their own personal enrichment while concealing from us that they were taking the Debtor's money as their own.

29.     Following the $1.5 million loan, we began asking Carrie Eddmenson roughly monthly to provide us with financial reports for the Debtor. The Debtor did not provide any such reports to us until some seven months later in February 2014. After several requests that went ignored, we eventually obtained certain documents, including a "Transaction Report" covering the period July 1, 2013 – January 31, 2014. (The period covered by that report began right before our July 13, 2013 loan to the Debtor.)

30.     Before our loan, the only transactions for the entire month of July 2013 were car insurance payments. But shortly after, the Eddmensons began a spending spree by using the Debtor's funds for personal needs and luxuries for themselves and, evidently, one or more pets. These expenditures nakedly contravened the promises the Eddmensons made to us about fiscal discipline, credit card use, and responsible spending. The Eddmensons flouted the provisions of their Employment Agreements and circumvented the controls they had agreed to.

31.     For example, within the first month after the Debtor received our loan proceeds:

a.      On August 5, 2013 they spent: (i) $92.01 at Wags and Whiskers (a pet supply store); (ii) $153.39 at Woodland Wine (a liquor store); and (iii) $2,580.49 at J. Crew (a retail clothing store); and

b.      On August 8, 2013 they spent: (i) $3,830 at Barneys (a high-end clothing store); (ii) $40.00 at iTunes; and (iii) $8.80 at Calypso Café (a restaurant).

32.    As the Transaction Report revealed, in subsequent months before financial records were shared with us, the Eddmensons further spent tens of thousands of dollars of the Debtor's money on further purchases at Barney's, Nordstrom, and other high-end store, spa visits, furniture, personal meals and entertainment, pet supplies, and groceries. These and more are reflected in the Transaction Report, a copy of which is attached to this declaration as Exhibit A.

33.    As the Transaction Report also revealed, the Eddmensons also made several "personal transfers" of the Debtor's funds to themselves, including but not limited to: (a) October 8, 2013 for $1,500; (b) October 21, 2013 for $900; (c) November 12, 2013 for $500; (d) November 21, 2013 for $4,000; (e) November 25, 2013 for $1,500.

34.    Quite simply, tens of thousands of dollars of the Debtor's funds were withdrawn from the Debtor's bank accounts and diverted and misappropriated by the Eddmensons to their personal bank accounts and were otherwise taken and used by them for their own personal benefit, contrary to their prior representations and promises and their contractual, legal, and fiduciary obligations.

35.    The Eddmensons actively and cravenly concealed these and other wrongful expenditures of the Debtor's money from us and ignored or refused our repeated requests to produce and share financial data with us.

36.    The Eddmensons knowingly and intentionally induced us to loan $1.5 million to the Debtor while concealing their true intentions—intentions they manifested with action—to spend the Debtor's borrowed money on themselves to support a lavish lifestyle of personal indulgence

while failing to meet any of the critical deadlines for developing a wholesale business.[1]

37.     The Eddmensons also used the Debtor's funds to purchase one or more motorcycles, thousands of dollars' worth of home furnishings, art, and vintage items. The Eddmensons made other improper expenditures of the Debtor' funds and treated the Debtor's funds as their own with no regard for corporate formalities, the prohibition against commingling the Debtor's assets and liabilities and their own, or their fiduciary duties to the Debtor's stakeholders.

38.     The Eddmensons never informed the Managers of how they were using the Debtor as their own private ATM machine, that they were spending astronomically more than the $15,000 the Operating Agreement permitted them to spend without the Managers' express approval.

39.     Shortly after learning about the Eddmensons's improper use of the Debtor's funds, I called and questioned Hughes, the controller, about what seemed to be excessive, improper spending. Clearly uncomfortable, Hughes pressed me to speak with Carrie Eddmenson directly. I did. I confronted the Eddmensons about their personal spending, violations of the Operating Agreement, and concealment on March 6, 2014. After extensive discussion, the Eddmensons insisted that some of the expenses were proper and promised to provide documentation for those expenses. They never did. As to other expenses, the Eddmensons admitted they were improper and in violation of the Operating Agreement.

40.     In fact, the Eddmensons's misspending and flouting of the operating agreement while concealing critical information from us continued.

---

[1] Matt Eddmenson, in particular, did virtually no work at all and did nothing to justify his executive salary except, on occasion, to make tee shirts for sale when the Debtor was short of cash owing to his and Carrie's improper misappropriation of the Debtor's operating funds.

For example, we believe that, in or around August 2015, the Eddmensons used the Debtor's funds to establish certain Debtor operations at 336 South Anderson Street, Los Angeles, California, 90033. They did so without any notice to or authorization from the Managers as required under the Operating Agreement. We believe that the Eddmensons changed their residence from Nashville to California owing to threatened legal action against them in Tennessee. They also moved the Debtor's workshop to Los Angeles without notice to or approval by the Managers.

41.    The Eddmensons also awarded themselves multiple salary increases without notice to or approval from the Managers, directly enriching themselves at the Debtor's expense. The Eddmensons gave themselves these increases although the Debtor was in perilous and worsening financial condition directly attributable to the Eddmensons' neglect of the business and gross dereliction of their operational and fiduciary duties.

42.    On or around July 15, 2016, Matt Eddmenson started "The Ides," a business whose Instagram page listed the Debtor's goods for sale. We believe that items listed for sale on the Ides' Instagram account "@theidesco", website "http://theides.co," and email address "theidesco@gmail.com" were designed and created in the Debtor's 336 S. Anderson Street facility. It is apparent that the Eddmensons founded The Ides to directly compete with and eventually overtake the Debtor at a time when the Debtor was at its most vulnerable—past due on its trade payables and generally not paying its debts as they came due. As the Debtor's presidents, their breach of their fiduciary and legal duties to the Debtor's stakeholders—creditors, members, business partners—could not be more stark.

43.    As of August 1, 2016, The Ides featured two rings for sale at $499 that were also listed for sale on the Debtor's website for $450. We

believe that the Eddmensons have transferred other assets from the Debtor's inventory and sold them on The Ides' social media accounts, pocketing the money for themselves. The Eddmensons have kept all of the proceeds of these sales, diverting the Debtor's property to their own use and benefit.

44. The Eddmensons have exploited their position as the Debtor's management and controlling members to enrich themselves at the expense of the Debtor's creditors (whose debt are not being paid) and the Debtor's other members. They have misappropriated the Debtor's money, merchandise, and intellectual property. They have enriched themselves while grossly mismanaging the Debtor's operations and financial affairs.

45. The Eddmensons courted me as an investor because of my reputation as an honest and highly-skilled businessman with years of retail sales expertise in the upscale clothing industry. To induce my wife and me to invest in the Debtor, the Eddmensons knowingly made false representations and promises, specifically representing and promising that if we would purchase an ownership interest in the Debtor, the Eddmensons would implement the Business Strategy.

46. The Eddmensons's representations and promises to us were materially false when made. We believe that the Eddmensons always intended to continue what we now understand (only after our investment) their previous practice to be—namely, using substantial portions of the Debtor's funds for their own personal use. The Eddmensons always intended to divert and misappropriate at least some funds to support themselves in a grossly lavish lifestyle, while failing to do everything they should have done— and promised to do—to grow or operate the Debtor's business.

47. The Eddmensons's promises and representations were material to us. In reasonable reliance on those promises and representations, we made

their investment in the Debtor. If the Eddmensons had not made the promises and representations described above, we never would have invested.

48.     The Debtor's creditors—notably my wife and I, who are owed $1.5 million under the $1.5M Note, which is in default and now fully due and payable—have suffered a substantial economic loss as a direct result of the Eddmensons's untrue statements.

49.     The Eddmensons routinely failed to timely provide requested and required financial reports and information. When the Eddmensons did provide such information, it was often late and contained mistakes and misstatements that concealed the nature and extent of the Eddmensons wrongful acts.

50.     The Debtor's brick and mortar store locations have suffered mightily under the Eddmenson's gross neglect. The stores barely have sufficient merchandise because the Eddmensons have failed to ensure the Debtor's manufacture of sufficiently finished goods ready for sale.

51.     The Eddmensons have run the Debtor to ground. According to the latest accounts payable information we were able to obtain from the Debtor, of the $223,550.52 in total accounts payable, 61.1% of that amount is over 90 days past due, 66.4% of that amount is over 60 days past due, and 85.0% of that amount is over 30 days past due.

52.     Most significantly, the $1.5M Note is now in default and fully due and payable. There can be no reasonable questions that the Debtor is not paying its debts as they come due. We believe the Debtor is insolvent on a balance-sheet basis, but the Eddmensons have ignored our requests for updated financial information.

53.     The relationship among the Debtor's five managers is deeply dysfunctional and irreparably broken. My wife and I, as two of the five

- 13 -

managers, uncovered the gross misdeeds and self-dealing by the Eddmensons, who until last week were two of the other three managers.

54.     The ill will we bear toward the Eddmensons, who deceived and defrauded us and squandered our carefully-considered investment, is considerable. Similarly, the Eddmensons have rebuffed overtures from us and have refused requests for information.

55.     The fifth manager, 41 Lyons, has been largely absent and has not been participating in any material way in the management of the Debtor. With 41 Lyon's absence, and two managers starkly at odds with two other managers, management is hopelessly deadlocked.


August 30, 2016                          Robert Lamey

                                         */s/ Robert Lamey*